J. A18010/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| JAMES O. PRESGRAVES, III, | : | No. 1832 MDA 2014 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, June 18, 2014,
in the Court of Common Pleas of Franklin County
Criminal Division at No. CP-28-CR-0000808-2012

BEFORE:  FORD ELLIOTT, P.J.E., STABILE AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JANUARY 22, 2016**

James O. Presgraves, III, appeals from the judgment of sentence of June 18, 2014, following his conviction of one count each of driving under the influence ("DUI") -- high rate of alcohol, DUI -- general impairment, and recklessly endangering another person ("REAP").  After careful review, we affirm.

The facts of this matter, as gleaned from the trial transcripts, may be summarized as follows:

Officer Matthew Lynch testified that in the early morning hours of January 21, 2012, at approximately 2:00 a.m., he was on routine patrol when he came upon a single vehicle accident near the intersection of Wayne Avenue and Second Street in Chambersburg.  (Notes of testimony, 4/8/14 at 7.)  Conditions were poor due to heavy snowfall.  (*Id.* at 8.)  Officer Lynch

was directed by a group of bystanders to a Jeep Grand Cherokee which had apparently crashed into a telephone pole. (*Id.* at 13.) Officer Lynch observed a female seated in the back seat, passenger side, who was in need of medical assistance. (*Id.* at 14.) She was moaning and her face was covered in blood. (*Id.*) Officer Lynch tried talking to her but she was nonresponsive. (*Id.* at 15.) Officer Lynch tried to keep her stationary until EMS arrived. (*Id.*)

Subsequently, Corporal Darren Helsel arrived on the scene with appellant. (*Id.* at 18.) Appellant indicated that the woman inside the vehicle was his wife, Stacey. (*Id.* at 19.) When appellant exited Corporal Helsel's vehicle, he had a significant amount of blood on his face and an injury to the upper-right portion of his head. (*Id.* at 20.) According to appellant, he and Stacey had met two people that night at a bar, a friend of hers and an unknown male individual. (*Id.* at 20-21.) They decided to leave the bar to go to the friend's house. (*Id.*) Appellant stated that the unknown male individual was driving the Jeep when it crashed. (*Id.* at 21.) Appellant did not know their names and had never met them before. (*Id.*) When Officer Lynch asked appellant why he left the accident scene, he claimed that he was chasing after the unknown male driver. (*Id.*)

After appellant and Stacey were transported to the hospital, Officer Lynch noticed an impact point on the inside of the windshield containing blood and hair. (*Id.* at 26-27; Commonwealth's Exhibit 12.) The

hair stuck in the glass matched appellant's hair color. (*Id.* at 27-28.) Later, at the hospital, Officer Lynch questioned appellant further about the details of the accident. At that time, appellant stated that they were at the Relax Lounge where they met up with Stacey's friend and her boyfriend. (*Id.* at 30.) Appellant reiterated that he had never met these people before. (*Id.*) After they left the bar, the unknown male was driving, Stacey was in the front passenger seat, appellant was seated behind Stacey in the right rear passenger seat, and the unknown male's girlfriend was seated in the left rear passenger seat. (*Id.*) According to appellant, there was a road rage incident with another vehicle, which caused the driver to lose control and strike the telephone pole. (*Id.* at 30-31.)

While he was talking, Officer Lynch noticed that appellant was giving off a strong odor of alcohol. (*Id.* at 32.) When Officer Lynch asked appellant how much he had to drink that night, appellant stated that he consumed four or five beers. (*Id.*) Appellant stated that he did not know how he hurt his head; however, Officer Lynch observed that the hair imbedded in the glass of the front windshield was the same color and length as appellant's. (*Id.* at 32, 36.)

Officer Lynch thought it was strange that no one else was found in the vicinity of the crash other than appellant. (*Id.* at 36-37.) Officer Lynch also found it odd that appellant would let his wife sit up front with a strange man, while he sat in the back with the man's girlfriend. (*Id.* at 37.) Officer Lynch

advised appellant that he believed he was the driver of the vehicle, and was intoxicated, and requested that he submit to chemical testing. (*Id.* at 37-38.) Appellant agreed, and they obtained a blood sample as well as a hair sample and a Buccal swab from the inside of appellant's cheek for DNA analysis. (*Id.* at 38, 57.) Appellant's blood alcohol concentration was 0.127 percent. (*Id.* at 39.)

Corporal Helsel testified that he was on routine patrol at 2:00 a.m. on January 21, 2012, when he received a dispatch regarding a traffic accident at the intersection of Catherine and Second Streets. (Notes of testimony, 4/7/14 at 125.) Corporal Helsel received information over police radio that witnesses saw an occupant of the vehicle leave the accident scene, traveling east on Catherine Street. (*Id.* at 126.) Corporal Helsel proceeded to the area and observed an individual in a dark hoodie. (*Id.* at 127-128.) Corporal Helsel did not see anyone else in the area at that time. (*Id.* at 128.) Corporal Helsel parked his patrol car and walked up to the individual. (*Id.*) He observed blood on the right side of his face, as well as a small laceration on his forehead. (*Id.*) Corporal Helsel identified this individual as appellant. (*Id.* at 129-130.) Corporal Helsel asked appellant if he was okay; appellant gave no response. (*Id.* at 130.) At that point, Corporal Helsel transported appellant back to the accident scene. (*Id.*)

Officer Matthew Bietsch testified that when he arrived on scene, Officer Lynch was already present. (*Id.* at 73.) Officer Lynch informed him

that there appeared to be someone missing. (*Id.* at 74.) Officer Bietsch observed footprints in the snow, leading away from the driver's side door of the Jeep. (*Id.* at 75.) Officer Bietsch saw only one set of footprints. (*Id.*) Officer Bietsch did not see any other footprints leading away from the vehicle. (*Id.* at 78.) Officer Bietsch testified that conditions were snowy and there was a fresh blanket of snow in the area. (*Id.*) Officer Bietsch followed the footprints east on Catherine Street and made contact with appellant and Corporal Helsel. (*Id.* at 76-79.) Appellant appeared to have an injury to the right side of his forehead. (*Id.* at 80.)

Thaddeus Ballard ("Ballard") testified that in the early morning hours of January 21, 2012, he was going home from the Relax Lounge on Orchard Drive in Chambersburg. (Notes of testimony, 4/7/14 at 3-4.) Ballard was accompanied by two of his cousins, and his brother. (*Id.* at 4.) Ballard could not remember who was driving. (*Id.* at 4-5.) Ballard came upon an accident at the corner of Second and Catherine Streets. (*Id.* at 5.) Ballard saw a Jeep that had struck a telephone pole. (*Id.* at 5-6.) They stopped and put their hazard lights on. (*Id.* at 8.) Ballard testified that a woman who appeared to be injured was inside the vehicle, on the passenger side. (*Id.*) The woman was moaning and bleeding from her head. (*Id.* at 8-9.)

While Ballard was looking inside the car, a man approached him. (*Id.* at 9.) Ballard described the man as Caucasian with long hair and blood on his face. (*Id.* at 10-11.) Ballard could not identify the individual at trial.

(*Id.* at 10.) Ballard told him that the female passenger looked like she was in trouble and he needed to call the police. (*Id.* at 9.) The male individual responded, "Don't call the cops; don't call the cops," and instructed Ballard "to say that a Mexican did it." (*Id.*) Ballard called 911, at which point the male individual ran away. (*Id.* at 10-11.) Ballard characterized his demeanor as "very, very scared." (*Id.* at 11.)

On January 26, 2012, a few days after the accident, Officer Lynch re-interviewed appellant. At this time, appellant's version of events changed significantly. Appellant stated that the vehicle was driven by an individual with the alias "Bear," who appellant knew from playing pool at Jim's Tavern in Greencastle. (Notes of testimony, 4/8/14 at 68-69.) There was no mention of a fourth person in the vehicle. (*Id.* at 69.) In addition, appellant now stated that at the moment of impact, he was leaning forward from the back seat giving his wife a kiss, instead of seated directly behind his wife next to the window on the rear passenger side. (*Id.* at 68.) Officer Lynch found this to be significant, as he had mentioned to appellant previously that there were hairs recovered from inside the front windshield. (*Id.*) Officer Lynch was unable to find anyone who went by the alias, "Bear." (*Id.* at 69-70.)

Officer Lynch testified that on January 31, 2012, he went to the Relax Lounge and Orchard's Restaurant to review video surveillance footage from

the night of the accident. (*Id.* at 73.)[1] Officer Lynch observed appellant and Stacey seated at a table in the bar by themselves. (*Id.* at 75.)[2] There was no one else around them. (*Id.*) At some point, appellant and Stacey got up and exited the bar. (*Id.*) Officer Lynch testified that although several other people left around the same time, it did not appear that appellant and Stacey were conversing with them or had any kind of relationship with them. (*Id.* at 75-76.)

Appellant and Stacey proceeded to the northeast corner of the parking lot. (*Id.* at 77.)[3] Their vehicle was just outside camera range. (*Id.* at 78.) After approximately 30 seconds, appellant walked back into view, and re-entered the bar using the same door. (*Id.* at 79-80.) Appellant was by himself; Officer Lynch could not see Stacey at that time. (*Id.* at 80.) According to Officer Lynch, appellant was "kind of mingling around." (*Id.*) Appellant spoke briefly to an unidentified female but no one else. (*Id.*) After several minutes, appellant left the bar again, returning to the northeast corner of the parking lot. (*Id.* at 80-81.) Appellant passed out of camera range. (*Id.* at 81.) After several seconds, Officer Lynch saw light from

---

[1] The Relax Lounge and Orchard's Restaurant are connected and owned by the same proprietor. (Notes of testimony, 4/7/14 at 47-48.)

[2] As discussed below, the actual video recordings were unavailable to play for the jury. Officer Lynch was permitted to testify to the contents of the recordings, with an appropriate cautionary instruction.

[3] The premises has 16 cameras both inside and outside the building. (Notes of testimony, 4/7/14 at 48.)

headlamps and a car appeared, driving across the parking lot towards Orchard Drive. (*Id.* at 81-82.) The vehicle appeared to be the same Jeep Grand Cherokee which was involved in the accident a short time later. (*Id.* at 82.) Officer Lynch was unable to see the occupants of the vehicle. (*Id.*) Officer Lynch testified that when he exited the bar, appellant was wearing a baseball cap. (*Id.* at 84.) Later, at the accident scene, Officer Lynch did not see a baseball cap. (*Id.*)

Timothy J. Gavel is a forensic scientist employed by the Pennsylvania State Police. (*Id.* at 156-157.) Mr. Gavel testified that appellant's DNA matched the blood sample from the interior windshield of the Jeep. (*Id.* at 162-163.) In addition, appellant's DNA matched a blood sample collected from the driver's side door, lower interior rocker panel. (*Id.* at 164-165.)

Appellant testified in his own defense. Appellant testified that he and Stacey went to the Relax Lounge to see a Led Zeppelin cover band called "Cashmere." (Notes of testimony, 4/9/14 at 32.) Appellant had been drinking and Stacey did not want to drive home in the snow. (*Id.* at 36-38.) According to appellant, Bear agreed to drive them home. (*Id.* at 39.) Appellant took Bear's baseball hat and put it on to ensure that Bear would not leave them. (*Id.* at 40.) Later, in the car, appellant returned the baseball hat to Bear. (*Id.* at 43-44.)

Appellant testified that Stacey was in the front passenger seat and he was in the back seat, in the middle, between the two front seats. (*Id.* at

44.) Appellant stated that he was leaning forward to kiss Stacey when he heard a loud noise and hit the windshield. (*Id.* at 44-46.) Appellant testified that after the accident, Bear left the scene. (*Id.* at 47.) Appellant chased after him, which is when he encountered Corporal Helsel. (*Id.* at 48-50.) Stacey testified on appellant's behalf and substantially corroborated his account of the accident. (Notes of testimony, 4/8/14 at 187-202.)

On April 9, 2014, following a jury trial, appellant was found guilty of two counts of DUI and one count of REAP. Appellant was found not guilty of aggravated assault by vehicle, aggravated assault by vehicle while DUI, and accident involving death or personal injury. (Notes of testimony, 4/9/14 at 186-189.) On June 18, 2014, appellant was sentenced to 12 to 60 months' imprisonment followed by 24 months of probation. On June 30, 2014, appellant filed a timely post-sentence motion,[4] including a challenge to the weight of the evidence, which was denied on October 28, 2014. Appellant complied with Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion.

Appellant has raised the following issues for this court's review:

A.   ISSUE 1:
     WHETHER THE TRIAL COURT ABUSED ITS
     DISCRETION IN PERMITTING OFFICER LYNCH
     TO NARRATE THE CONTENTS OF THE RELAX
     LOUNGE VIDEO RECORDING IN LIEU OF
     PRODUCING THE ACTUAL RECORDINGS AND

---

[4] The actual tenth day following sentencing was Saturday, June 28, 2014; therefore, appellant had until the following Monday, June 30, 2014, to file his post-sentence motion. 1 Pa.C.S.A. § 1908.

WHETHER FROM A PRAGMATIC RELEVANCE PERSPECTIVE SUCH TESTIMONY [SIC] PROBATIVE VALUE OUTWEIGHED THE DANGERS OF UNFAIR PREJUDICE AND POTENTIAL TO MISLEAD THE JURY[?]

B.   ISSUE 2: DID THE TRIAL COURT'S DECISION TO DENY APPELLANT'S MOTION FOR A NEW TRIAL MISAPPLY THE LAW TO THE EXTENT IT FAILED TO EXERCISE ITS JUDICIAL "JUDGMENT" IN REACHING A DISPASSIONATE CONCLUSION WITHIN THE FRAMEWORK OF THE LAW[?]

Appellant's brief at 8.[5]

In his first issue on appeal, appellant argues that the trial court erred in granting the Commonwealth's pre-trial motion ***in limine*** to permit Officer Lynch to testify regarding the contents of the videotape recordings from the Relax Lounge. Appellant argues that the Commonwealth acted in bad faith by failing to preserve the original recordings and that Officer Lynch's testimony was barred by the best evidence rule. In addition, appellant contends that any probative value Officer Lynch's testimony had was outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. We disagree.

Our standard of review regarding the admissibility of evidence is an abuse of discretion. "[T]he admissibility of evidence is a matter addressed to the sound discretion of the trial court and . . . an appellate court may only reverse upon a showing that the trial court abused its discretion."

---

[5] Remaining issues raised in appellant's Rule 1925(b) statement, including a challenge to the discretionary aspects of his sentence, have been abandoned on appeal. (***Id.*** n.2.)

> ***Commonwealth v. Weiss***, 565 Pa. 504, 776 A.2d 958, 967 (2001) (citations omitted). "An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." ***Commonwealth v. Hoover***, 16 A.3d 1148, 1150 (Pa.Super.2011).

***Commonwealth v. Collins***, 70 A.3d 1245, 1251-1252 (Pa.Super. 2013),

***appeal denied***, 80 A.3d 774 (Pa. 2013).

> The "Best Evidence Rule," as articulated by the common law, very literally only pertained to writings or other documentary evidence. As our Court has described the common-law rule in a prior case:

>> The "best evidence" rule limits the method of proving the terms of a writing to the presentation of the original writing, where the terms of the instrument are material to the issue at hand, unless the original is shown to be unavailable through no fault of the proponent. McCormick, Evidence 560 (2nd ed. 1972). The Pennsylvania courts use the "best evidence" rule when the contents of documentary evidence are at issue. ***Ledford v. Pittsburgh & Lake Erie R.R. Co.***, 236 Pa.Super. 65, 345 A.2d 218 (1975). The best evidence rule is controlling only if the terms of a writing must be proved to make a case or provide a defense. McCormick, ***supra***.

***Commonwealth v. Fisher***, 764 A.2d 82, 87-88 (Pa.Super. 2000), ***appeal***

***denied***, 782 A.2d 542 (Pa. 2001), quoting ***Commonwealth v. Harris***, 719

A.2d 1049, 1051 (Pa.Super. 1998).

> However, the Pennsylvania Rules of Evidence have expanded the scope of the common-law rule by

applying it to other forms of evidence such as recordings and photographs. The common-law rule has been incorporated into and amplified by Pennsylvania Rule of Evidence 1002 which provides:

> [An original writing, recording, or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise.]

*Id.*, quoting Pa.R.E. 1002 (rescinded and replaced Jan. 17, 2013, effective March 18, 2013).

However, Pa.R.E. 1004 provides, *inter alia*, that "An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if: (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith[.]" *See Commonwealth v. Dent*, 837 A.2d 571, 589 (Pa.Super. 2003), *appeal denied*, 863 A.2d 1143 (Pa. 2004) ("If the originals are not available at trial in criminal cases, through no fault of the Commonwealth, secondary evidence is permissible.") (citations omitted).

> At common law, the "best evidence" rule limited proof of the terms of a writing to production of the original document, if the terms of the instrument were material to the issue under review, unless the original was shown to be unavailable through no fault of the proponent. Traditionally, Pennsylvania courts applied the "best evidence" rule when the content of documentary evidence was at issue; that is, when the terms of the writing had to be proved to make a case or provide a defense.

*Id.* at 588-589, citing ***Fisher***, ***supra***; Binder on Pennsylvania Evidence § 10.02 at 613.

The trial court held an evidentiary hearing on the Commonwealth's motion on April 1, 2013. Officer Lynch testified that after reviewing the surveillance tape, he asked the owner, Michael Kalathas ("Kalathas"), for a copy. (Notes of testimony, 4/1/13 at 20.) Kalathas stated that he could save it on his computer; however, he did not know how to copy or "burn" it onto a compact disc ("CD"). (***Id.***) Kalathas said that he would have to call the security company, TelePlus, and have them burn a copy onto a CD. (***Id.*** at 20-21.) Officer Lynch testified that he was unfamiliar with the security system and would have been unable to burn a copy himself. (***Id.*** at 21.) Officer Lynch asked Kalathas to save a copy of the video, and Kalathas assured him that it would be stored indefinitely. (***Id.***) Officer Lynch testified, "I asked him if there was any kind of time frame of when it would be deleted and he told me that they were stored indefinitely until he would go and delete it from that point." (***Id.***)

Approximately two months later, Officer Lynch was advised by the district attorney's office that they would need to preserve the video onto a CD for trial. (***Id.*** at 22.) Officer Lynch immediately contacted Kalathas and asked him to have the security company copy the video onto a CD. (***Id.***) At that point, Officer Lynch was informed by Kalathas that the hard drive had been replaced and that he would need to contact the security company

directly. (*Id.* at 23.) Officer Lynch called the security company and was told they would have to look at the hard drive to determine whether the video was still available. (*Id.*) Officer Lynch asked the security company to contact Kalathas and get back to him if the footage was able to be saved, but no one ever got back to him. (*Id.* at 23-24.)

Kalathas testified that after viewing the video, Officer Lynch asked him to save the footage from two cameras, one showing the parking lot and one showing the inside of the bar area. (*Id.* at 6.) Kalathas testified that he saved the relevant portions onto a recording device connected to the camera system. (*Id.*) However, he was not able to burn a copy onto a CD. (*Id.*) According to Kalathas, approximately two months later, they were having trouble with the security camera system and TelePlus came in and revamped it. (*Id.* at 7.) As a result, Kalathas lost the video footage that Officer Lynch asked him to save, as well as some other recordings. (*Id.*) Kalathas testified that the video footage was not able to be recovered. (*Id.*)

Clearly, the video recordings were unavailable through no fault of the Commonwealth. Officer Lynch watched Kalathas save them and was assured that they would remain on the recording device. Immediately after being informed by the district attorney's office that they needed a CD of the video, Officer Lynch contacted Kalathas. Unfortunately, in the interim, the hard drive had been removed and the video was irretrievably lost. *See Dent*, 837 A.2d at 590 (surveillance videotape at issue was unavailable at

trial where the computer system failed soon after the incident and the hard drive had to be completely replaced).

There is simply no evidence of bad faith misconduct on the Commonwealth's part. Appellant contends that Officer Lynch did not immediately request Kalathas to contact TelePlus and have the video burned onto a CD because of concerns about cost. Officer Lynch did testify that he assumed the security company would charge Kalathas for burning the videos onto a CD. (Notes of testimony, 4/1/13 at 22.) However, Officer Lynch explained that at that point, he was not even sure the video footage would be necessary and he did not want Kalathas to incur unnecessary cost. (*Id.*) Officer Lynch testified that cost was not the only reason he did not ask Kalathas to have a CD made at the outset. (*Id.* at 31.) Officer Lynch explained,

> It was my belief that there's going to be a cost incurred for calling up a security company to come there to download that video. Based upon what Mr. Kalathas said was that the video would be saved indefinitely and that it was something if it would be needed at a later time we would be able to attain that. And, to be quite honest, very few of our cases go to this point, that actually go to trial. So if we were pursuing every single case with every piece of evidence, you know, the people who are maintaining these security systems, then when we do have a stabbing or some other related nature there, we sometimes will meet resistance.

*Id.* at 29-30.

The bottom line is that Officer Lynch had no reason to believe the video recordings would not be saved indefinitely, in case he needed them in the future. He had no reason to anticipate any problems with the security system. What occurred with the hard drive was an unforeseen circumstance. The trial court accepted the testimony of Kalathas that the security company inadvertently deleted the relevant video footage along with several other recordings during its overhaul of the security system. (Order, 4/3/14 at 2; docket #28.) The trial court found that while Officer Lynch could have been more diligent in securing the recordings, his actions did not constitute bad faith. (*Id.*)

Appellant also argues that the evidence had little probative value, as Officer Lynch admitted he could not see inside the Jeep and did not know how many people were inside when it pulled out of the bar parking lot. (Appellant's brief at 30.) Officer Lynch could not see inside the windows of the Jeep and did not know who was driving. (*Id.*) In addition, Officer Lynch was unfamiliar with Bear and so there was no reason to think he would be able to identify him, even if he were present in the bar that night. (*Id.* at 31.) According to appellant, Officer Lynch's testimony regarding the contents of the video merely served to distract the jury from its critical fact-finding determination of whether appellant was driving. (*Id.*) We disagree.

> Otherwise relevant evidence may be excluded if its
> probative value is outweighed by its potential for

> prejudice. "The probative value of the evidence might be outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, pointlessness of presentation, or unnecessary presentation of cumulative evidence." *Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa.Super. 2009) (citing *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 141 (2007) (citing Pa.R.E. 403)). "The comment to Pa.R.E. 403 instructs that: '"Unfair prejudice" means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.'" *Id.* (quoting Pa.R.E. 403). However, "[e]vidence will not be prohibited merely because it is harmful to the defendant." *Dillon*, 925 A.2d at 141. "[E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Commonwealth v. Owens*, 929 A.2d 1187, 1191 (Pa.Super. 2007) (citing *Commonwealth v. Broaster*, 863 A.2d 588, 592 (Pa.Super. 2004)).

*Commonwealth v. Antidormi*, 84 A.3d 736, 750 (Pa.Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Instantly, Officer Lynch's testimony concerning the video surveillance footage he viewed at Relax Lounge was relevant to prove appellant was the driver of the Jeep the night of the accident. As recounted above, Officer Lynch saw appellant and Stacey seated at a table in the bar by themselves. They were not speaking with anyone. When they left the bar, although other people left around the same time, they did not appear to be interacting with anyone. Although the Jeep was out of camera range and

Officer Lynch could not see how many people were in the Jeep when it left the parking lot, the testimony was clearly relevant.[6]

In addition, we agree with the trial court that the probative value of the testimony was not outweighed by its potential for unfair prejudice, confusion of the issues or misleading the jury. (Order, 4/3/14 at 4.) Officer Lynch admitted that he could not see inside the vehicle and did not know how many people were inside. Officer Lynch could not see who was driving the vehicle. Officer Lynch noted that appellant was wearing a baseball hat inside the bar, but none was found at the scene of the accident, which actually supports appellant's story about taking Bear's baseball hat to make sure he would drive them home.

We also note that the trial court gave an appropriate cautionary instruction to the jury. (Notes of testimony, 4/8/14 at 71-72.) The trial

---

[6] The trial court determined that evidence of the content of the video recordings was admissible because it was not closely related to a controlling issue in the case, and was merely collateral. (Order, 4/3/14 at 2-3.) *See* Pa.R.E. 1004(d) ("An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if: (d) the writing, recording, or photograph is not closely related to a controlling issue."). We respectfully disagree with this analysis. Clearly, the evidence was being admitted to establish that appellant was driving the vehicle, which is an essential element of the crimes charged. Appellant did not dispute that he was drinking that night and was inside the vehicle when it crashed. The only issue at trial was who was driving the vehicle. Therefore, the evidence was not merely collateral. However, it is well established that this court may affirm the trial court on any basis. *See Commonwealth v. Harper*, 611 A.2d 1211, 1213 n.1 (Pa.Super. 1992) (this court "may affirm the decision of the trial court if there is any basis on the record to support the trial court's action. This is so even if we rely upon a different basis in our decision to affirm[]") (citations omitted).

court did not err in granting the Commonwealth's motion *in limine* and allowing Officer Lynch to testify regarding the content of the surveillance videos.

Next, appellant challenges the weight of the evidence to support the jury's verdict. According to appellant, a finding that he was driving the Jeep at the time of the accident amounts to little more than conjecture and speculation. (Appellant's brief at 33.) Appellant argues that there was no direct evidence to prove he was driving the Jeep at the time of the accident. (*Id.* at 34.) Appellant points to Officer Lynch's testimony regarding his observations of the Relax Lounge video footage as corroborating his version of events, *i.e.*, reentering the bar to find Bear. (*Id.* at 35.) Appellant points out that Ballard, who was drinking that evening, was unable to positively identify appellant as the man he encountered at the scene. (*Id.* at 37.) Appellant argues that he and Stacey offered the only first-person, eyewitness testimony of who was driving the vehicle that night. (*Id.* at 36.)

> A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice.
>
> *Commonwealth v. Lyons*, ___ Pa. ___, 79 A.3d 1053, 1067 (2013).
>
> The Pennsylvania Supreme Court has reiterated the proper standard of review of a weight claim as follows:

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail."

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the

weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

> ***Commonwealth v. Clay***, ___ Pa. ___, 64 A.3d
> 1049, 1054-1055 (2013) (citations omitted)
> (emphasis in original).

***Commonwealth v. Orie***, 88 A.3d 983, 1015-1016 (Pa.Super. 2014),

***appeal denied***, 99 A.3d 925 (Pa. 2014).

In denying appellant's post-sentence weight of the evidence claim, the trial court determined there was sufficient circumstantial evidence for the jury to find that appellant was, in fact, the driver of the vehicle. As recounted in depth ***supra***, the video footage from the Relax Lounge did not show appellant and Stacey speaking with anyone at the bar. When Ballard arrived on scene shortly after the crash, he encountered appellant, who told him not to call the cops and to say a Mexican did it. As the trial court states, while Ballard could not identify appellant at trial, the jury could fairly make that inference. (Trial court opinion, 10/28/14 at 3.) Appellant fled from the scene and was discovered by Corporal Helsel a short distance away, bleeding from the head. There were no other footprints in the freshly fallen snow leading away from the Jeep. When he was brought back to the crash site, appellant told Officer Lynch that there were four people in the car, himself, Stacey and two others whom he had never met before. Appellant also related that he was seated directly behind Stacey, in the right rear passenger seat. Later, after Officer Lynch told him that blood and hair was found on the interior windshield, appellant changed his story and stated that he was sitting in the middle of the back seat, giving his wife a kiss when the

accident occurred and he was thrown into the windshield. Also, appellant stated for the first time that an individual named "Bear," who police could not locate, was actually driving the car. Appellant's DNA matched blood recovered from inside the windshield and also from the driver's side door.

Clearly, the jury rejected as not credible appellant's self-serving story about someone named "Bear" driving the Jeep. There was simply no evidence, other than the testimony of appellant and his wife Stacey, to support the theory that anyone else was in the vehicle. The jury's verdict hardly shocks the judicial conscience. The trial court did not abuse its discretion in denying appellant's weight of the evidence claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/22/2016